[No. 1872.]

## JOHN ANDERSON *v.* THE STATE.

1. BURGLARY — DEFINITION OF A TERM.— Article 709 of the Penal Code, defining burglary, defines "house" to be "any building or structure erected for public or private use, . . . of whatever material it may be constructed."

2. SAME — RULE OF CONSTRUCTION.— It is a statutory rule of construction in this State that "all words used in the Penal Code, except when a word, term or phrase is specially defined, are to be taken and construed in the sense in which they are understood in common language, taking into consideration the context and subject-matter relative to which they are employed." This rule must be applied in this case. Webster defines a "building" to be a "fabric or edifice constructed; a thing made, as a house, a church," etc. A "structure" he defines to be "a building of any kind, but chiefly a building

of some size, or of magnificence; an edifice." Bouvier defines a building to be " an edifice erected by art, and fixed upon or over the soil, composed of brick, stone, marble, wood or other proper substance, connected together, and designed for use in the position it is so fixed." " An office " is defined by Webster to be " the place where a particular kind of business or service for others is transacted; a house or apartment in which public officers or others transact business." *Held*, that an " office " may be a " house " within the meaning of the statute defining the offense of burglary, though it be a structure inside of the building.

3. SAME. — It is well settled, both by the common law and the adjudications of this State, that a burglary may be committed on the inside of the main house; for, though a thief enter the house through an open door, yet if, when within the house, he turn the key or unlatch a chamber door with intent to commit theft, this is burglary.

4. SAME — BREAKING — FACT CASE. — The slightest force constitutes a breaking, such as the lifting of the latch of a door that is shut, the raising of a window, the entry at a chimney or other unusual place. See the statement of the case for evidence *held* sufficient to show a breaking, and to support a conviction for burglary.

APPEAL from the District Court of Nolan. Tried below before the Hon. T. B. Wheeler.

The conviction in this case was for the burglary, in Nolan county, Texas, on the 15th day of October, 1884, of the office of J. A. J. Bradford, and the theft therefrom of $6. A term of two years in the penitentiary was the punishment awarded.

J. A. J. Bradford was the first witness for the State. He testified that he was a resident of the town of Sweetwater, Nolan county, and was the agent in charge of the lumber yard of Elliott & Roe. Witness was in town attending to his business on the 15th day of October, 1884, when the defendant was arrested upon this charge. The circumstances connected with the detection and arrest of the defendant upon this charge were related by the witness as follows:

" I suspected that the defendant was stealing, and thought that he was trying to steal from me, and acting upon that suspicion prepared a trap for him. In the presence of County Attorney Ragland, I marked a five-dollar currency bill so that I would know it. I put that five-dollar bill and a dollar and a half dollar in coin in the wooden drawer of the safe in my office. My office is inside of a hardware house that is now run in connection with the lumber yard. That house is about twenty feet wide and fronts south. It is considerably longer than it is wide. The house is partitioned off into different rooms, and the front or south apartment is used as a storeroom for paints, glass, nails, and such hardware. My office is in the southwest corner of that front room, in the front end of the house.

It is about eight by ten feet in size, and is partitioned off from the balance of the house. The door or gate entrance of the office is about three or four feet from the main front door at the south end of the house, and is west and to the left of the south door of the house as it is entered. The office door or gate swings or opens outward into the main room. This door or gate fastens with a latch. A string extending from the inside of the gate to a beam inside the office had a weight attachment which would close or shut the gate. The office described was used by me as a depository for records, papers, books, accounts and money accumulating in the conduct of the lumber business. No person other than I had control of that office.

"It was about 10 o'clock A. M. when I put the money described in the safe in my office. I closed but did not lock the safe, left the house door open, and went across the street to a drug store. In about fifteen minutes I went back to my office, opened the safe and found the money unmolested. I then left the money in the drawer in the safe, locked the drawer, but left the key in it, and closed but did not lock the safe. About this time I saw the defendant coming alone towards the house in which my office was situated. Thereupon I turned the safe combination to the opening number, and left it so that the safe could be opened by turning the handle and pulling the door. I then walked out of my office, passing out of the back or north door of the main room, and passed slowly around towards the front door. I saw no one in my office as I stepped out of the north door of the main house, but heard a clicking noise, such as is made by a safe when, by a turn of the handle, it is locked or unlocked. As I went into the house again I heard my office door or gate swing to and latch. The defendant was then standing about two feet north of my office and but a few, perhaps four, feet from a door which led west from the hardware room into the street. I immediately examined my money drawer and found that the five-dollar bill and the coin dollar had been removed, leaving the half dollar in the drawer. I immediately arrested the defendant, who still had the currency bill in his hand.

"I then took the defendant to County Attorney Ragland and Doctor R. N. Lee, and Mr. Ragland took the money, the five-dollar currency bill and the coin dollar, from the person of the defendant. I readily identified the five-dollar bill as the same one I had marked and put in the safe drawer. I could not identify the silver dollar, as I had not marked it, and it resembled other federal coins of the same denomination. The last time I saw that money before the

arrest of the defendant, it was in the safe drawer. The defendant was not employed about the lumber yard, and he had no right, either by permission or otherwise, to enter my office or take my money. In order to get that money the defendant unlatched my office gate or door, opened that door, opened the safe, and unlocked and opened the drawer. He had only to turn and pull the handle in order to open the safe. The money described belonged to me, or was under my control, and it was taken by the defendant in Nolan county, Texas, on the 15th day of October, 1884, without my consent. I had no conversation with the defendant after I marked the bill and put it and the silver money in the drawer. I did not, at any time, suggest to the defendant, or procure a suggestion to him, to enter my office and take that money.

" That office was made for the protection of my books, papers, accounts and money. The partition or picket wall that is around my office was made to keep people out of the office and away from my books, papers, etc. The weight was attached to the gate for the express purpose of keeping it closed so as to exclude people. My office had no other opening or entrance than the gate described. A person could not get into my office except through that gate, unless by scaling the pickets or climbing in through a window. The gate was the only regular or usual entrance to the office."

Cross-examined, the witness said: " The main house, or hardware room, in which my office is situated, was open. I marked the bill and put it in the safe for the express purpose of catching the thief. I left the safe purposely so that it could be opened by turning the handle. When I went out, I saw the defendant coming, and I expected him to steal the money. He was the one person I had in my mind, and I expected no one else to steal it. I went out of the house purposely to afford the defendant an opportunity to steal the money. My office, situated in the southwest corner of the hardware room, is made of pickets. The pickets are about four feet high, an inch square, and about three inches apart. There is a plank on the top of the pickets on the north side of the office, which is sometimes used by people as a desk for writing or figuring. The door or gate of the office is made of sharp flat pickets, four feet high and two inches apart. It has a gate latch and opens outwards into the main room. The weight on the string attached pulls the gate closed and latches it whenever it is opened. That gate was shut when I went out of the office just before the defendant entered it. I cannot swear positively that it was latched, but it was shut,.

and it always latches when it shuts. I have never seen it fail to latch when it closes, and I have no doubt in the world about it being latched when I left it on this occasion. Both doors of the main room, the south and west, were open when the defendant went in. There was a space of about six feet between the top of the pickets and the ceiling overhead."

R. A. Ragland testified, for the State, that, on the 15th day of October, 1884, he saw the defendant in charge of Mr. J. A. J. Bradford, and, in the presence of Doctor R. N. Lee and Mr. Bradford, received from the hands of the defendant a five-dollar currency bill and a silver dollar. Witness identified the bill instantly as one which, a half hour before, he saw Mr. Bradford mark, and with a dollar and a half dollar in silver, put in his safe in his office, for the purpose of baiting and apprehending some person suspected of stealing. Witness did not speak to the defendant on that day previous to his arrest, and did not suggest to him the possibility of stealing that money, or procure such suggestion to be made.

The motion for new trial raised the question discussed in the opinion.

*F. G. Thurmond,* for the appellant.

*J. H. Burts,* Assistant Attorney General, for the State.

WILLSON, JUDGE. This conviction is for burglary committed in the daytime. The place entered by the defendant was an office inside a hardware house. This office is described by the owner or occupant thereof as follows: " It is about eight by ten feet in size. It is in one corner of the hardware room; is made of pickets; the pickets are four feet high and about one inch square, and about three inches apart. There is a plank on top of the pickets on one side, which was sometimes used as a desk or place to figure on. The door or gate of the office is made of flat, sharp pickets, four feet high, and two inches apart. This gate or door has a latch, and the gate opens to the outside into the main room, and the weight on the string on the inside pulls the gate shut whenever it is opened. The gate latches whenever it is pulled shut by the weight. There was an open space of about six feet between the top of the pickets and the ceiling of the house, and a person could get into the office by climbing over the pickets, without going in at the door or gate."

It is shown by the evidence that the doors to the hardware house were open. Defendant went into the hardware house and into this office, and opened the door of an unlocked safe, and took therefrom

$6 in money. There is no question as to defendant's guilt of the theft of the money. There is in fact but one question presented by this record which it is necessary that we should discuss, and that is, was the office or place entered by defendant, and in which he committed the theft, a *house* within the meaning of the statute defining the offense of burglary?

By that statute a house is defined to be "any building or structure erected for public or private use . . . of whatever material it may be constructed." (Penal Code, art. 709.) This definition is broad and indefinite, and fails to convey any very specific meaning as to what *buildings* or *structures* are intended to be embraced within it. Webster defines a "building" to be "a fabric, or edifice constructed; a thing built, as a house, a church," etc. A "structure," he defines to be "a building of any kind, but chiefly a building of some size, or of magnificence; an edifice." (Webster's Dic., Words "Building," "Structure.") Mr. Bouvier defines a building to be "an edifice, erected by art, and fixed upon, or over the soil, composed of brick, stone, marble, wood, or other proper substance connected together, and designed for use in the position it is so fixed." (Bouvier's Law Dic., "Building.")

All words used in the Penal Code, "except where a word, term or phrase is specially defined, are to be taken and construed in the sense in which they are understood in common language, taking into consideration the context and subject-matter relative to which they are employed." (Penal Code, art. 10.) Now in common language, taking into consideration the context and subject-matter, is an office or place such as the one in question in this case, a "building or structure?" What is such a place commonly called? In this case, the witnesses call it an *office*, and by this designation, we think, such an apartment is commonly known? What, then, is the meaning of the word "office" in this connection? Webster defines it to be, "the place where a particular kind of business, or service, for others is transacted; a *house* or apartment in which public officers and others transact business; as, the register's office; a lawyer's office." (Webster's Dic., "Office.") The apartment in question here comes precisely within the above definition. It was the place where the account books, money, etc., of a lumber company were kept, and where the business of said company was transacted by their agent or clerk. It was a place partitioned off, and used separately from any other portion of the hardware house, for a particular business. It was in fact, and as commonly understood, a *room* in said hardware house, as much so as if its walls had been solid and close to

the top of the ceiling. It is well settled by the common law that a burglary may be committed on the inside of the main house; for though a thief enter the house through an open door; yet if, when within the house, he turn the key or unlatch a chamber door, with intent to commit theft, this is burglary. (1 Whart. Cr. Law, §§ 762, 763; 2 Bish. Cr. Law, §§ 97, 98; *Martin* v. *The State*, 1 Texas Ct. App., 525.)

We are of the opinion that the place, office, apartment or room in question in this case comes within the meaning of a "*building*," "*structure*," "*house*," as used in our statute relating to burglary. We think the evidence sufficiently proves that the office was entered by defendant by *breaking*. The slightest force constitutes a breaking, such as the *lifting the latch of a door* that is shut, the raising of a window, the entry at a chimney, or *other unusual place*. (Penal Code, art. 708.) In this case the evidence satisfactorily shows that the defendant entered the office where he committed the theft either by *lifting the latch* of the door thereto, or by climbing over the picket inclosure, and if he entered by the latter mode, it would be entering at an *unusual place* and would be a *breaking*, under our statute.

There is no error in the charge of the court. It presents correctly and clearly all the law of the case. Nor did the court err in refusing the special charges requested by defendant, because, to the extent that the same are correct and applicable, they were substantially embraced in the charge given to the jury. We perceive no error in the conviction, and the judgment is affirmed.

*Affirmed.*

[Opinion delivered December 10, 1884.]